IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

TRACY SOULLIERE
o/b/o N.N.S., a minor                                                    PLAINTIFF

                    v.                    Civil No. 09-2128

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                          DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Tracy Soulliere, brings this action on behalf of her daughter, N.N.S., seeking

judicial review, pursuant to 42 U.S.C. § 405(g), of a decision of the Commissioner of the Social

Security Administration (Commissioner) denying her application for child supplemental security

income (SSI) benefits under Title XVI of the Social Security Act (the "Act").

**I.      Procedural Background:**

Plaintiff protectively filed an application for SSI on N.N.S.'s behalf on May 23, 2006,

alleging a disability onset date of July 7, 2005, due to dysfluency, oppositional defiant disorder

("ODD"), and status post brain tumor removal.  Tr. 106-11, 73-74, 81, 124, 133.  At the time of

filing, N.N.S. was four years old, a preschooler under the Act.  Tr. 81; 20 C.F.R. § 416.926a(g)(2).

Plaintiff's claims was denied both initially and on reconsideration.  Tr. 93-95, 98-101.  At

Plaintiff's request, an administrative hearing was held on December 5, 2007.  Tr. 45-72.  Plaintiff

was present at the hearing and represented by council.  In a written decision dated April 1, 2008, the

Administrative Law Judge ("ALJ") found that N.N.S. was not disabled within the meaning of the

Act. Tr. 75-92. On September 10, 2009, the Appeals Council declined to review this determination,

thus making the ALJ's decision the final decision of the Commissioner. Tr. 1-4. Plaintiff now seeks

judicial review of this decision.

II.   **Factual Background:**

On July 7, 2005, N.N.S. underwent surgery at Arkansas Children's Hospital for the removal of a benign posterior fossa tumor.  Tr. 184-204.  At a follow-up appointment dated March 7, 2006, Badih Adada, M.D., stated that N.N.S. had done "very well" since her surgery.  Tr. 203.  An MRI of N.N.S.'s brain showed good tumor resection without any evidence of recurrence.  Tr. 202-04, 220-21.

On April 5, 2006, N.N.S. was evaluated by Carol Woodward (program coordinator) and Jayne Korkames (teacher) for special education services at Stepping Stone Preschool, a preschool for developmentally delayed children.  Tr. 248-50.  On the Development Assessment of Young Children ("DAYC"), N.N.S. demonstrated a 27% delay in motor functioning, a 37% delay in cognition, a 32% delay in self-help, a 30% delay in social development, and a 37% delay in language (verbal and nonverbal). Tr. 248-49. On the Battelle Developmental Inventory, N.N.S. demonstrated a 34% delay in personal-social development, a 48% delay in adaptive development, a 39% delay in fine motor development, a 46% delay in gross motor development, a 41% in overall motor skills, a 34% delay in communication, a 30% delay in cognitive skills, and a 39% overall delay.  Tr. 38. These scores indicate that N.N.S. was functioning two standard deviations below her age level in most categories.  Tr. 38.  On the Vineland Adaptive Behavior Scales, N.N.S. demonstrated a 62% delay in communication, a 53% delay in daily living skills, a 53% delay in socialization, and a 39% delay in motor area.  Tr. 38.  Her overall composite score was 1.7 years, which was consistent with a 55% delay.  Tr. 38.  Based on these scores, N.S.S. was recommended for early childhood special education services.  Tr. 38.

AO72A
(Rev. 8/82)

On April 11, 2006, N.N.S. underwent a physical therapy evaluation with Deborah Ashworth, P.T.  Tr. 244.  At 43 months of age, N.N.S. tested at a 33 month level on the Peabody Developmental Motor Scale ("PDMS"), which was consistent with a 23% delay in gross motor skills, and a 42 month level on the West Haverstraw Test of Posture and Locomotion.  Tr. 245.  Range of motion was within normal limits, although N.N.S. exhibited slightly lower strength levels when compared to other children of her age.  Tr. 247.  Ashworth believed N.N.S.'s scores were due to a lack of previous exposure to the activities tested rather than a true gross motor delay.  Tr. 247.  She did not believe N.N.S. qualified for physical therapy, but recommended some exercises to improve her gross motor development.  Tr. 247.

In April 2006, N.N.S. was referred to L. Michel McConathy, Psy.D., at Western Arkansas Counseling and Guidance Center by her primary care physician.  Tr. 205-09.  N.N.S. was reportedly throwing temper tantrums, which included yelling, screaming, throwing things, breaking toys, aggression towards adults and peers, physical acts (kicking, biting, hitting) and self-injurious behaviors (banging head against the wall).  Tr. 205.  By her mother's report, N.N.S. also had difficulties with attention and concentration, moodiness, and sleep disturbances.  Tr. 205.  N.N.S. was not taking any medications at this time.  Tr. 207.

Upon examination, N.N.S. was alert, oriented and responsive.  Tr. 207.  She exhibited mild hyperactivity, was easily distracted and bored, and frequently switched tasks.  Tr. 207.  She would request her mother's assistance in performing tasks that were well within her abilities, but would easily complete them by herself when encouraged to do so.  Tr. 207.  N.N.S. demonstrated mild articulation problems, but her rate and quantity of speech were age-appropriate.  Tr. 207.  Dr. McConathy noted that N.N.S. willingly shared her thoughts and feelings, chose tasks that were

3

challenging, tried or asked to try new things, made decisions for herself, and showed affection to familiar adults. Tr. 206. However, he also observed that N.N.S. was easily frustrated, had a short attention span, and was easily distracted. Tr. 206. At the end of the interview, N.N.S. began crying, yelling, and screaming because she wanted to continue to play games. Tr. 207. Dr. McConathy intervened and instructed Plaintiff on behavioral modification techniques to curb N.N.S.'s attention-seeking and disruptive behaviors. Tr. 208.

Overall, Dr. McConathy found that N.N.S. was personable, engaging, and playful, but lacked insight and judgment. Tr. 208. He diagnosed N.N.S. with oppositional defiant disorder, phonological disorder (by report), conduct disorder (provisional), primary insomnia (provisional), and R/O attention-deficit/hyperactivity disorder, bipolar disorder (family history), and schizophrenia (family history). Tr. 208. Dr. McConathy estimated N.N.S.'s current GAF score at 48. Tr. 208. He recommended continued therapy with N.N.S., but noted that Plaintiff demonstrated minimal motivation regarding her own participation. Tr. 208.

Dr. McConathy treated N.N.S. from April 2006 through September 2006. Tr. 222-38. He reported some progress in N.N.S.'s overall behavior and noted that N.N.S. did not show any type of disruptive behavior/tantrums at school. Tr. 224. He also noted some improvement at home, as N.N.S.'s mother began implementing the behavioral modification strategies discussed in prior appointments. Tr. 229. On September 22, 2006, Dr. McConathy estimated N.N.S.'s GAF score at 56. Tr. 232. In a Physician Certification statement, Dr. McConathy indicated that N.N.S. suffered from a "serious emotional disturbance."[1] He noted only minimal overall achievement in correcting

---

[1] Children with a serious emotional disturbance are persons: (1) from birth up to age eighteen; (2) who currently or at any time during the past year have had a diagnosable mental, behavioral or emotional disorder of sufficient duration to meet diagnostic criteria specified within the DSM IV; and (3) this disorder resulted in

4

N.N.S.'s disruptive and attention-seeking behaviors at home.  Tr. 234.  In explaining his findings,

Dr. McConathy stated that Plaintiff did not seem motivated or grasp the significance of parental

skills/discipline.  Tr. 234.  By the end of treatment, Dr. McConathy stated that the initial treatment

goals had not been achieved.  Tr. 238.

On May 10, 2006, N.N.S. had an electroencephalogram ("EEG") performed at St. Edward

Mercy Medical Center.  Tr. 210.  The results were normal and there was no indication of any

epileptic activity.  Tr. 210.

On May 22, 2006, N.N.S. went to Robert B. Knox, M.D., for an eye examination.  Tr. 216.

Dr. Knox noted a significant amount of farsightedness and astigmatism, for which N.N.S. was given

a glasses prescription.  Tr. 216-19.  Otherwise, her examination was unremarkable.  Tr. 216.

N.N.S. presented to Summit Medical Center on June 30, 2006, with complaints of headaches.

Tr. 294-297.  A head CT revealed an area of decreased attenuation within the left of the cerebellum

consistent with an old injury or infarct.  Tr. 297.  Otherwise, there were no hemorrhages, hematomas,

or mass lesions demonstrated.  Tr. 297.

On August 24, 2006, N.N.S. underwent an occupational therapy re-evaluation.  Tr. 31-33.

At this time, she had been receiving occupational therapy two times per week to improve her fine

motor development skills.  Tr. 31.  Patricia Marquis, an occupational therapist, noted good progress

in fine motor development.  Tr. 31.  On the PDMS, N.N.S. demonstrated significant delays in manual

dexterity and slight delays in eye-hand coordination.  Tr. 32.  On the Mullen Scales of Early Learning

("MSEL"), N.N.S. demonstrated significant fine motor delays.  Tr. 32.  Range of motion, muscle

---

functional impairment which substantially interferes with or limits the child's role or functioning in family, school, or community activities.  A "functional impairment" is defined as a GAF score of 60 or below.  Tr. 233.

tone, muscle strength, and muscle control were all within normal limits.  Tr. 32.  Based on her evaluation, Marquis recommended occupational therapy services twice a week to help improve N.N.S.'s eye-hand coordination and manual dexterity skills.  Tr. 32.

Michelle Real, a speech pathologist, completed a Speech and Language Evaluation Report on October 3, 2006.  Tr. 29-30. On the Clinical Evaluation of Language Fundamentals-Preschool ("CELF-P"), N.N.S. received a 75 in Receptive Language, a 67 in Expressive Language, and a 69 in Total Language.  Tr. 29.  Her expressive and total language scores indicated a severe delay with more than 2.0 standard deviations below the mean.  Tr. 29.  On the Oral and Written Language Scales ("OWLS"), N.N.S. received a 76 in Listening Comprehension, a 73 in Oral Expression, and 73 Oral Composite, indicating a moderate delay for expressive and receptive language skills.  Tr. 29.  N.N.S. tested within the normal range on the Goldman-Fristoe Test of Articulation-2.  Tr. 30.  Her oral motor structure and function, hearing, and vocal quality were within normal limits.  Tr. 30.  Overall, N.S.S.'s score indicated a moderate to severe delay for expressive language skills and a moderate delay for receptive language skills.  Tr. 30.  Real recommended that N.N.S. receive speech and language therapy three times per week to improve her receptive and expressive language skills.  Tr. 30.

On November 20, 2006, N.N.S. underwent a speech and language evaluation with Sharee Davidson, a speech pathologist.  Tr. 251-53.  On the Goldman-Fristoe Test of Articulation-2 ("GFTA-2"), N.N.S.'s scores were consistent with a mild articulation disorder.  Tr. 251.  On the CELF-P, N.N.S. received a total language score of 80, which was within the mildly disordered range.  Tr. 252.  It was Davidson's belief that N.N.S. suffered from a mild articulation and language disorder and showed characteristics of a neurogenic fluency disorder.  Tr. 253.  Davidson recommended

AO72A
(Rev. 8/82)

speech therapy to address N.N.S.'s language, articulation and fluency deficits.  Tr. 253.  She noted that 50% of N.N.S.'s speech was intelligible on the first attempt and 75% or more was intelligible with repetition.  Tr. 254.

In a Childhood Disability Evaluation Form dated December 4, 2006, Stephen A. Whaley, M.D., reviewed N.N.S.'s records and determined that she suffered form dysfluency, ODD, and status post remote resection of benign intracranial tumor.  Tr. 259-64.  He found that N.N.S.'s impairments were severe, but did not meet, medically equal or functionally equal the Listings.  Tr. 259.  In his functional equivalence evaluation, Dr. Whaley found less than marked limitations in interacting and relating with others and no limitations in acquiring and using information, attending and completing tasks, moving about and manipulating objects, caring for yourself, and health and physical well-being.  Tr. 261-62.  These findings were affirmed by Frazier Kennedy, M.D., on March 15, 2007.  Tr. 340-45.

On December 11, 2006, N.N.S. underwent a head CT without contrast.  Tr. 290.  Results were compatible with a residual postoperative cavity and were unchanged from June 30, 2006.  Tr. 290.

In a Teacher-Educator Domain Performance Assessment dated December 15, 2006, Theresa Cox, N.N.S.'s preschool teacher, evaluated N.N.S.'s functioning in five of the functional domains.  Tr. 265-69.  In the domain of acquiring and using information, Cox found extreme limitation in five subsections and marked limitations in two subsections.  Tr. 265.  In the domain of attending and completing tasks, she found one area of extreme limitation, five areas of marked limitation, and four areas of moderate limitation.  Tr. 266.  In the domain of interacting and relating with others, she found two areas of extreme limitation, ten areas of marked limitation, two areas of moderate

7

limitation, and one area of slight limitation.  Tr. 267.  In the domain of moving about and manipulating objects, Cox found four areas of moderate limitation and two areas with no limitation. Tr. 268.  In the domain of caring for self, she found three areas of marked limitation, four areas of moderate limitation, and one area of no limitation.  Tr. 269.

On March 27, 2007, N.N.S. underwent a special needs assessment at Stepping Stone Preschool.    Tr. 36-38.    On the DAYC, N.N.S. demonstrated a 20% delay in gross motor/perceptual/fine motor coordination, a 37% delay in cognition (reasoning, problem solving, and knowledge), a 36% delay in self-help, a 31% delay in social development, and a 31% delay in language (verbal and nonverbal).  Tr. 37.

In an Annual Review Form dated March 29, 2007, N.N.S. had achieved 46 out of 46 initial objectives in her pre-school special education courses.  Tr. 246.  She was able to match letters and numbers, complete a fifteen to twenty five piece puzzle, tell her age upon request, complete dressing frames, hop on one foot, and play simple group games.  Tr. 246.  It was recommended that N.N.S. continue receiving individualized program placement to meet her needs in the areas of cognitive, communicative, social, and adaptive skills.   Tr. 246.   She would also continue speech and occupational therapy.  Tr. 246.  As N.N.S. demonstrated only minor delays in normal gross motor development, she was not recommended for direct physical therapy services.  Tr. 247.

On May 12, 2007, N.N.S. underwent a psychological evaluation with Paula Testerman, a psychological examiner at Stepping Stone.  Tr. 22-28.  She was four and a half years old at the time of testing.  Tr. 22.  On the Wechsler Preschool Intelligence Test, N.N.S. received a verbal score of 79 (borderline), a performance score of 86 (low average), and a full-scale score of 85 (low average), placing her in the low average range of intelligence.  Tr. 22-24.  On the Woodcock Johnson III

Achievement Test, N.N.S. received a 79 in Letter-Word Identification (borderline), a 92 in Spelling (average), a 91 in Applied Problem Solving (average), and a 91 in Oral Comprehension (average). Tr. 22.   N.N.S. scored within the average range of functioning on the Wepman Auditory Discrimination Test and the Developmental Test of Visual-Motor Integration.  Tr. 22.  On the Vineland Adaptive Behavior Scales, N.N.S. tested on a 3.8 age level in motor skills, a 3.2 age level in social skills, a 3.2 age level in language skills,  a 2.3 age level in cognition, and a 2.11 age level in self-help abilities.  Tr. 24.  A total adaptive age level of 3.3. was identified in the significant range for self-help and adaptive skills.  Tr. 24.  Overall, N.N.S. was functioning in the low average range of intelligence.  Tr. 25.  Based on these scores, Testerman recommended special services including extended time for completion of assignments, shortened assignments, repeated reviews, and drills. Tr. 25.

In kindergarten, N.S.S. received one hour of speech therapy twice a week.  Tr. 159-61.  In a progress report dated October 19, 2007, N.S.S. had mastered 35% of her goals in listening and communication.  Tr. 162.

In September 2007, the Qualls Early Learning Inventory was administered to N.N.S.  Tr. 175. Her scores indicated that she was still developing in the areas of general knowledge, oral communication, written language, math concepts and work habits, and was not developed in the area of attentive behavior.  Tr. 175

In a Skills Assessment, N.N.S.'s kindergarten teacher, Sara Wilson, noted that N.N.S. could recognize, state, and write her name and knew the first and last names of her parents.  Tr 181.  She did not know her address, telephone number, or birthday.  Tr. 181. Additionally, she could not demonstrate self-help (buttons, ties, zippers, snaps) and did not know the names of colors, but knew

9

her shapes.  Tr. 181.  She could identify numbers one through five and knew most of her upper and lowercase letters.  Tr. 181.  Additionally, she knew how to use language to question, discuss and share, and could speak in complete sentences.  Tr. 182.  She showed interest in literature when read to and had no trouble listening and following directions.  Tr. 182.  She demonstrated no problems with fine motor control (crayons, pencils, scissors, and glue).  Tr. 182.  Mathematically, she was able to count by rote, count objects, construct a set, recognize numerals and match numerals to a set.  Tr. 182.  Behaviorally, N.N.S. consistently interacted well with adults, focused her attention on selected activities, participated without encouragement, and completed tasks in a timely manner.  Tr. 183.  She sometimes interacted well with students, followed classroom rules, and showed responsibility for school property and personal belongings.  Tr. 183.  Ms. Wilson commented that N.N.S. was "a good student."  Tr. 183.

### III.   **Applicable Law:**

The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2003).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion."  *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)).  In determining whether evidence is substantial, the court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it.  *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)).  If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents

AO72A
(Rev. 8/82)

the [Secretary's] findings," then the decision must be affirmed. *Cox v. Astrue*, 495 F.3d 614, 617

(8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be disabled under the Act, a child must prove that he "has a medically determinable

physical or mental impairment, which results in marked and severe functional limitations," and

which has lasted or can be expected to last for at least twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i);

20 C.F.R. § 416.906. In determining whether a claimant under the age of eighteen is disabled, the

ALJ undertakes a sequential three-step evaluation. *Moore ex rel. Moore v. Barnhart*, 413 F.3d 718

(8th Cir. 2005); 20 C.F.R. § 416.924(a). The ALJ first determines whether the child is engaged in

substantial gainful activity. 20 C.F.R. § 416.924(b). If the child is so engaged, he will not be

awarded SSI benefits. *Id.* At the second step, the ALJ determines whether the child has an

impairment or combination of impairments that is "severe." 20 C.F.R. § 416.924(c). To be deemed

severe, an impairment must be more than "a slight abnormality . . . that causes no more than minimal

functional limitations." *Id.* At the final step, the ALJ determines whether the child has an

impairment or impairments that meet, medically equal, or functionally equal a listed impairment.

20 C.F.R. § 416.924(d).

The claimant has the burden of showing that his impairment meets or equals a listing.

*Jackson v. Astrue*, 314 Fed. Appx. 894, 895 (8th Cir. 2008) (citing *Johnson v. Barnhart*, 390 F.3d

1067, 1070 (8th Cir. 2004)). To meet a listing, an impairment must meet all the specified criteria.

*Id.* A child's impairment medically equals a listed impairment if it "is at least equal in severity and

duration to the medical criteria of the listed impairment." 20 C.F.R. § 416.926(a); *Neal ex rel.*

*Walker v. Barnhart*, 405 F.3d 685, 689 (8th Cir. 2005). Even if a child's impairments do not meet

a listing, he will be awarded benefits if his impairments "functionally" equal a listed impairment.

AO72A
(Rev. 8/82)

20 C.F.R. § 416.926a(a).  To determine whether an impairment functionally equals a disability

included in the Listings, the ALJ must assess the child's developmental capacity in six specified

domains.  20 C.F.R. § 416.926a(b)(1).  The six domains are:  (1) acquiring and using information;

(2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and

manipulating objects; (5) caring for yourself; and, (6) health and physical well-being.  20 C.F.R. §

416.926a(b)(1); *see also Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 722 n. 4 (8th Cir. 2005).

To functionally equal a listing, an impairment must result in "marked" limitations in two domains

of functioning or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).

A marked limitation is an impairment that seriously interferes with the child's ability to

independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).  It is "more than

moderate" but "less than extreme."  *Id.*  An extreme limitation is defined as "more than marked," and

exists when a child's impairment(s) interferes very seriously with his ability to independently initiate,

sustain or complete activities.  20 C.F.R. § 416.926a(e)(3)(i).  Day-to-day functioning may be very

seriously limited when an impairment(s) limits only one activity or when the interactive and

cumulative effects of the impairment(s) limit several activities.  *Id.*

In determining the degree of limitation in each of the six domains, the ALJ is required

to analyze the child's subjective complaints in accordance with the seven factors from 20 C.F.R. §

416.929(c).  Specifically, the ALJ must consider these factors: (1) the child's daily activities; (2) the

location, duration, frequency, and intensity of the child's pain or other symptoms; (3) the

precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of the child's

medication; (5) treatment, other than medication, that the child receives or has received for relief of

pain or other symptoms; (6) any measures the child uses or has used to relieve his or her pain or other

12

symptoms; and (7) other factors concerning the child's functional limitations or restrictions due to pain or other symptoms. *See* 20 C.F.R. § 416.929(c)(3); *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1984. The ALJ is not required to methodically discuss each factor as long as the ALJ acknowledges and examines those factors prior to discounting the subjective complaints regarding the child's functional limitations. *See Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000).

### IV.   **Discussion:**

Plaintiff contends that the Commissioner's decision is not supported by substantial evidence. Specifically, Plaintiff raises the following issues: (1) whether the ALJ erred in his functional equivalence determination; and (2) whether the ALJ fully and fairly developed the record. Pl.'s Br. 9-14; ECF No. 14. For reasons explained below, we find that substantial evidence does not support the ALJ's determination and we remand this case for further development of the record.

Plaintiff argues that the ALJ failed to fully and fairly develop the record. Pl.'s Br. 13-14. We agree. The medical evidence of record shows that N.N.S. scored two standard deviations below the mean in several categories of functioning on various standardized tests.[2] Tr. 24, 29, 37-38, 248-49. On the Battelle Developmental Inventory, N.N.S. scored two standard deviations below the mean in personal-social development, adaptive development, gross motor development, overall motor function, and communication. Tr. 38. On the DAYC (administered March 31, 2006), N.N.S. demonstrated a 27% delay in motor functioning, a 37% delay in cognition, a 32% delay in self-help, a 30% delay in social development, and a 37% delay in language. Tr. 248-49. A year later, N.N.S. demonstrated a 20% delay in motor functioning, a 37% delay in cognition, a 36% in self-help, a 31%

---

[2] A "marked" limitation is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. 20 C.F.R. § 416.926a(e)(2).

13

delay in social development, and a 31% delay in language, showing minimal, if any, progress.  Tr. 37.  On the Vineland Adaptive Behavior Scales (administered March 31, 2006), N.N.S. had an overall composite score of 1.7 years, which was consistent with a 55% delay.  Tr. 38.  In May 2007, N.N.S. received scores in the significant range in the areas of cognition and self-help.  Tr. 24.  On the MSEL, N.N.S. demonstrated significant fine motor delays, which qualified her for occupational therapy.  Tr. 32.  On the PMDS, N.N.S. demonstrated significant delays in manual dexterity.  Tr. 32.  However, a month and a half later, N.N.S.'s scores on the PMDS fell within the mildly disordered range.  Tr. 252.  CELF-P results revealed a severe delay in expressive and total language ability.  Tr. 29.  Due to her developmental delays, N.N.S. received both occupational and speech therapy as well as early childhood special education services.  Tr. 29-32, 38.

Dr. McConathy, N.N.S.'s psychologist, noted that N.N.S. had a "serious emotional disturbance."  Tr. 233.  He diagnosed N.N.S. with ODD and gave her estimated GAF score of 48.  Tr. 208, 232.  By the end of treatment, Dr. McConathy gave N.N.S. an estimated GAF score of 56 and opined that the initial treatment goals had not been met.  Tr. 232, 238.

Despite significant developmental delays and low GAF scores, the ALJ determined that N.N.S. had no limitations in acquiring and using information, attending and completing tasks, moving about and manipulating objects, caring for yourself, and health and physical well-being, and less than marked limitation in interacting and relating with others.  Tr. 86-92.  In making this determination, the ALJ relied solely on the medical opinions of non-treating, non-examining physicians.  *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (The assessment of a doctor who evaluates a claimant once or not at all does not usually constitute substantial evidence).  There are no RFC assessments from any treating physician or counselor to aid in determining N.N.S.'s

14

limitations.  In fact, the only functional assessment in the record is from Theresa Cox, N.N.S.'s preschool teacher.  Tr. 265-69.  According to Cox, N.N.S. had extreme and marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for self.  Tr. 265-69.  Although this functional assessment appears to be very restrictive, there are no other assessments (from those in contact with N.N.S.) to serve as comparison.  For this reason, we believe more information is required to make a fully informed decision.  *See Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995) (ALJ should obtain additional medical evidence if the record does not provide a sufficient basis on which to make a decision).

Accordingly, we find that substantial evidence does not support the ALJ's decision and we reverse this case for further development of the record.  On remand, the ALJ should direct interrogatories to Dr. McConathy, N.N.S.'s teachers, and her speech and occupational therapists to determine her level of functioning in each of the six domains.

**V.    Conclusion:**

We conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 8th day of November 2010.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE

15